**SO ORDERED.**

**SIGNED this 21 day of April, 2010.**



_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RIM DEVELOPMENT, LLC | ) | **Case No. 10-10132** |
| | ) | **Chapter 11** |
| Debtor-in-Possession. | ) | |
| | ) | |

## ORDERS ON SINGLE ASSET REAL ESTATE, STAY RELIEF,
## AND CASH COLLATERAL MOTIONS

Three matters came before the Court on April 8, 2010: (1) Textron Financial Corporation's

(TFC")'s) motion for Declaration of Single Asset Real Estate (Dkt. 49); TFC's motion for stay relief

(Dkt. 86); and (3) RIM's motion for a final order on cash collateral usage (Dkt. 6). The Court

conducted an evidentiary hearing on the latter two matters and, based upon counsel's representations

in open court at the beginning of the hearing, TFC and RIM now stipulate that the debtor's estate

-1-

consists of single asset real estate as that term is defined in 11 U.S.C. § 101(51B).[1]

I.    **Background**

    A.    Structure and Holdings of the Debtor

    The debtor, RIM Development, L.L.C. is a Kansas limited liability company. Its members are Inland Constructors, Inc., RAM Engineering, Inc., and Irons Development Corporation.[2] Inland owns 33.333334 percent of RIM and the others own an equal share of the balance. Debtor's wholly owned subsidiary, Steward Management, L.L.C., manages the 72 town homes that have been constructed on the property.

    RIM is developing a tract of approximately 500 acres of real property in Riley County, Kansas situated near the city of Ogden. Ogden is about three miles west of Fort Riley, home of the U.S. Army's 1st Infantry Division. RIM has platted this real estate as the River Trail Addition to Ogden and plans to create a variety of residential and light commercial uses on it. At present, there are 72 town homes that are completed and rented, 18 pad sites with foundations, 168 platted sites with utilities that are ready for town homes to be constructed on them, and undeveloped acreage. Some of the property is planned for various commercial uses, including the installation of self-storage facilities and a medical office facility. The Junction City-Ogden-Manhattan area has been ripe for residential and commercial development as our country's participation in the Iraq and

---

    [1] Debtor appeared by Susan G. Saidian. Textron Financial Corporation appeared by John W. McClelland. CoreFirst Bank & Trust appeared by Thomas J. Lasater. BG Consultants, Inc. appeared by William J. Bahr. Unless otherwise noted, all statutory references are to the Bankruptcy Code, Title 11 U.S.C., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act.

    [2] The principals of debtor's members are Art Robertson (Inland), Rick Meisinger (RAM) and Jack Irons (Irons).

Afghanistan wars has intensified over the past nine years and additional forces are trained at and deployed from Fort Riley. Some additional synergy is provided by the proximity of this area to Kansas State University, Interstate 70, and the anticipated National Bio Agro-Defense Facility (NBAF).

The property lies south of the present alignment of Kansas Highway 18 which runs south and west below Ft. Riley and east several miles to Manhattan. The City of Ogden lies to the west. The State of Kansas has condemned part of the land to build a redesigned interchange between K-18 and K-118. The state court awarded the debtor just compensation for this taking in the amount of approximately $1.4728 million. The debtor, Textron, CoreFirst Bank, and BG Consultants all claim an interest in this award as well as the remaining real property. The result of the condemnation and eventual construction will be to impose a flowage easement for waste-water runoff that will divide the property in two parts and that will prevent development on a sizeable portion of it.

The property is subject to liens that secure the following approximate amounts of indebtedness–

| Real Estate Tax | $12,000.00 |
|---|---|
| CoreFirst Bank | $1,606,000.00 |
| TFC | $9,410,000.00 |
| Kolde Construction | $47,000.00 |
| B&G Consultants | $590,800.00 |
| **Total Debt/Liens** | **$11,665,800.00** |

In prior hearings, both TFC and CoreFirst have contended that their respective liens attach to different portions of the property, but no proof concerning that was offered at the most recent hearing. Each has filed several mortgages that purport to attach portions of the property. The Court

-3-

has briefly examined the two lenders' proofs of claim and concluded that, for today's purposes, it need not parse out who is prior to whom on which tracts. What is important here is the total amount of the indebtedness that encumbers the land and whether that total exceeds the land's value. Therefore, any assumptions the Court makes concerning the relative priority of the liens are subject to revision when that issue comes into play. The liens of Kolde and B&G are mechanics's liens filed under KAN. STAT. ANN. § 60-1101, *et seq*. and may also be subject to later challenge based on either state law or the bankruptcy code.

B.    Status of the Case

Debtor filed this petition on January 22, 2010 and checked the "single asset" box on its petition. Thereafter, it amended that petition and checked the "other" box, prompting TFC to file its motion to declare single asset real estate. There are unsecured creditors in addition to the secured creditors referenced above. When the case was filed, the Court considered several preliminary matters and granted the debtor an interim order allowing the use of cash collateral.[3] That consists of the rents from the 72 finished town homes. Although CoreFirst first filed a mortgage on the land on which these town homes were erected, it later subordinated its liens to TFC's construction mortgages. Therefore, TFC has a first lien in the rents as cash collateral. The Court also allowed limited relief from the automatic stay to the Kansas Department of Transportation ("KDOT") to proceed in eminent domain to take the highway and flowage easements discussed above and to allow the District Court of Riley County to determine the just compensation

---

[3] Dkt. 26, 32.

-4-

for that taking.[4]

The parties have requested and the Court has granted continuances of the final cash collateral hearing while the debtor and TFC have attempted to work out their differences concerning the debtor's budget and whether the debtor has adequately insured TFC's collateral. At present, the remaining issues are the scope and extent of the insurance coverage and the amounts that the debtor should be permitted to compensate its members' principals for their services in this reorganization.

TFC has filed its motion for stay relief for cause, alleging that it has been denied adequate protection, and for lack of equity.[5] CoreFirst, B&G, and the debtor oppose that motion. The issues there revolve around whether the debtor is adequately protecting the rents and the physical collateral; the collateral's value; and whether there is an effective reorganization in prospect. As noted above, the debtor and TFC agree that the property is in fact single-asset real estate. If the property is single asset real estate, § 362(d)(3) terminates the stay unless the debtor (1) files a plan within 90 days of the date of the petition; or (2) begins paying monthly interest installments based upon the contract rate of the debt. The 91st day after the petition date is April 23, 2010.

## II.    Findings of Fact

### A.    Single Asset Status

In § 101(51B), "single asset real estate" is defined as real property that is a single property or project that generates all or substantially all of the debtor's gross income and upon which no business other than business of operating the real property is being conducted. A residential single

---

[4]  Dkt. 62. The Court later granted utility ONEOK's motion for similar relief involving its condemnation of an easement to move a natural gas pipeline necessitated by the re-routing of K-18 and K-114. Dkt. 108.

[5]  Dkt. 86.

-5-

asset must have more than four residential units. Here, all of the property is a planned development that contains a multiplicity of complementary intended and actual uses. There is an operating town home neighborhood of 72 units and many more are to be built. There is commercial space to be developed as well. The sole income from the property so far is the sales of the rentals and the operation of those as yet unsold. The debtor contemplates selling dirt and rock from the unusable areas of the development to the road contractors re-locating K-18. The debtor also has water rights that allow it to sell water from under the property to the contractors. In short, all of the debtor's income appears to come from the property and is the result of development activities concerning the tracts or funds received from their operations.

B.     <u>Facts Relevant to Adequate Protection</u>

Textron asserts that the insurance coverage provide by the debtor is insufficient and, in fact, expired after the petition date. TFC's Credit and Security Agreement clearly requires the debtor to "procure and maintain" full insurance coverage in an amount equal to the replacement value of the collateral. Textron has now force-placed coverage on the town home properties. The presence and sufficiency of insurance has been an issue in the case since the first day. As of January 22, 2010, the petition date, the debtor had provided TFC with a certificate that indicated $1.0 million in general liability coverage on the properties and casualty coverage that provided for the replacement value of the nine town home properties in the aggregate amount of $10.336 million.[6] This certificate also indicated that TFC was noted as a loss payee on the policies. The insurance indicated on this certificate expired on March 1, 2010. The court notes that the initial cash collateral budget proposed by the debtor and approved by the Court included a monthly charge of $5,500 for

---

[6] Exhibit L.

Case 10-10132   Doc# 153   Filed 04/21/10   Page 6 of 26

insurance premiums.

Exhibit R is a certificate of the coverage that the debtor offered to TFC to replace the previous coverage. This insurance would become effective on March 1, 2010 and again provided for $1.0 million in general liability, but substantially reduced the replacement coverage on the town homes to approximately $5.7 million. On March 2, TFC force-placed insurance on the debtor's property, providing for $5 million in general liability and replacement coverage on the town homes in the approximate aggregate amount of $6.038 million.

The debtor introduced Exhibit 15 which is a "Valuation" dated March 17, 2010 and issued by EMC Insurance. This document is not a certificate of coverage, but indicates that the debtor sought some form of replacement coverage. One of the principals of the debtor testified that this information was provided to TFC as evidence of insurance coverage in mid-March. The Valuation suggests that EMC believes the properties were under-insured on the March, 2010 certificate. EMC set the replacement value of the nine town home buildings at approximately $8.628 million, nearly $3.0 million more than the March 1, 2010 certificate provided.

The debtor has accumulated rents of $37,000 in excess of the cash collateral budget and those rents are in escrow with counsel to the debtor. Only at the April 8 hearing did the Court learn that there are additional excess rents of $35,000 that have been turned over by the debtor to its counsel for deposit in escrow. Therefore, the rent escrow has grown to $72,000.

The debtor owes ad valorem taxes to Riley County of at least $12,000. Rick Meisinger testified that general taxes due and owing for all of tax year 2008 and the first half of tax year 2009 amount to $84,000 in general taxes and $95,000 in special taxes levied to repay general obligation bonds issued by the City of Ogden or other issuing municipalities. These past-due taxes constitute

Case 10-10132    Doc# 153    Filed 04/21/10    Page 7 of 26

a senior lien on the land that is superior in priority to any of the creditors' liens in this case.

      C.      <u>The Value of the Property and Lack of Equity</u>

At the hearing, TFC and the debtor presented expert witnesses to testify concerning the value of the development. There is no controversy that, in some manner, the secured creditors claim an interest in the condemnation award of $1.4782 million. Nor do any of the parties dispute that the secured creditors claim a lien in the surplus rents currently in the debtor's counsel's possession, approximately $72,000. More vigorously disputed is the value of the land and improvements.

The Court received the oral testimony and reports of two appraisers and admitted a third appraiser's testimony by deposition. Each of the three appraisers reached reasonably similar conclusions as to the value of certain components of the property, but differed significantly in their conclusions as to the value of the platted, but not built, town home lots.

The appraisers considered four categories of property: the 72 completed town homes, the platted lots for town homes that have not been built (168 Platted sites), the lots on which only foundations have been laid (18 Pad sites), and the remaining undeveloped land. TFC relied on the testimony and reports of Robin Marx of Bliss Associates and Larry Witt of Dillon & Witt.[7] The debtor relied on the testimony and reports of Brian Klahr of Martens Appraisers.[8] Messrs. Marx and Witt appraised all of the property while Mr. Klahr only had time to appraise the town homes, lots and foundations and therefore rendered no opinion concerning the value of the undeveloped land. Both Marx and Witt employed the various appraisal methodologies of comparative sales, income, and cost analyses in reaching their conclusions. Marx's appraisal was made for eminent

---

[7] Ex. U and V.

[8] Ex. 17.

domain purposes while Witt's was prepared for TFC's use in defending its position in this case. In valuing the town homes, Marx relied on the comparative sales while Witt and Klahr utilized both a comparative sales analysis and an income analysis. All of the appraisers employed the comparative sales approach in valuing the unbuilt lots. Each valued the foundations by using the Marshall Appraisal Guide as a reference to the cost of laying foundation pads. Marx and Witt looked at comparative sales in valuing the undeveloped ground.

      1.     The 72 Town Homes

Marx valued the town homes at $6.1 million. He reached that conclusion by reviewing three comparative sales in Manhattan, Junction City and Tonganoxie, Kansas. He used data concerning those sales to calculate the "effective gross income multiplier" (EGIM) which is the dividend of the amount received for the sale of a property divided by the gross rents and other charges it earns. Based upon rent-roll information he received from the debtors, he calculated that the gross rents for the 72 units would be $76,550 per month or $918,600 annually. He subtracted 5 per cent for credit and vacancy losses, or $45,930, and calculated effective gross income (EGI) of $872,670. Having performed similar calculations for the three comparative sales, he concluded that those properties' EGIM's ranged from 6.49 to 8.9 and estimated that River Trail's EGIM is 7. Multiplying the EGI by 7 yielded $6.108 million. Marx tested this value against the 8 actual sales of town homes by the debtor which yielded an average price of $77.55 per square foot. Multiplying this amount by the total square footage yielded a value of $9.79 million that Marx discounted by a 40 per cent "bulk sale" discount, resulting in a $5.9 million value. Marx concluded that the EGIM analysis was more reliable and valued the town homes at $6.1 million.

Witt followed essentially the same analytical path that Marx trod, but reached a slightly

different conclusion by calculating a higher EGIM of 7.43 that yielded an income approach value of $6.488 million, rounded to $6.5 million. Using the same comparative sales, Witt calculated a slightly higher EGIM by taking an average of the three comparative sales' EGIM's. Like Marx, Witt determined the square foot price of the development based on the eight actual sales of town homes, multiplied that price by the total square footage, and found a gross sales price of $9.8 million. Unlike Marx, Witt applied a one-third bulk sale discount to reduce the $9.8 million value to $6.5 million.

Klahr had better access to the debtor's proprietary financial information. He was able to analyze the income of the town homes using the March 19, 2010 rent roll and he imputed expenses to calculate stabilized net income of $602,356. In doing this, however, Mr. Klahr only allowed for a 2.5 per cent vacancy and credit loss as opposed to the 5 per cent loss allowed by the other two experts. To this amount, he applied a capitalization rate of 8.5 per cent to yield an income-based value of $7.09 million, rounded to $7.1 million. Klahr arrived at his cap rate by comparison with industry standard rates, extracting rates from the sale of leased rental properties in the area, and the "band of investment" technique that considers return of and return on investment. He tested this conclusion by comparing the sales of other town home and apartment complexes in the area, in Lawrence, and in Wichita to establish a range of per-unit sale values. He then performed a regression analysis that compared per unit sales prices and per-unit NOI to determine that the town home units should be valued at $98,012. Multiplied by 72, the sale value of the town homes would be $7.056 million. He did not apply a bulk sale discount to this calculation, presumably because the comparative sales were also bulk sales with the discount included "in the price."

-10-

The Court concludes that the value of the town homes is more likely than not $7.1 million.[9] Mr. Klahr's calculations, based on his superior access to debtor's business information, were persuasive and, at least in the short term, the debtor's records support the 2.5 per cent vacancy rate that very likely explains the $600,000 difference between Klahr's value and that determined by Mr. Witt.

2.      The 18 Pad Sites

The three appraisers each used the Marshall cost handbook to determine the cost of laying pads or foundations for future town homes. Marx attributed $140,000, Witt $115,000, and Klahr $100,000. Witt and Klahr did not incorporate the $40,000 that Marx attributed to the apartment pad. This omission was not explained. The Court concludes that the value of the pads is $140,000.[10]

3.      The Undeveloped Land

Only Marx and Witt appraised the undeveloped land. The Marx report ascribes a series of values to four "tracts" into which he divided the land for appraisal purposes. These four tracts make up 341 acres of land which, based on comparative sales, he values at $2.22 million before the KDOT taking. His report also values the useful remainder of the property after the KDOT taking. Marx estimates that the amount of land "unencumbered" by the condemned easements would be about 140 acres. This land he values at $575,000. Other "encumbered" land is valued at $499,000.

The Witt report also values the undeveloped tracts based on comparative sales of similar property. Witt valued the land after the taking. He appraised 142 acres that he notionally subdivided into tracts. Using the "developed income approach," which takes into account not only

---

[9]  *See* Ex. 17, p. 8-2 (Klahr appraisal).

[10]  *See* Ex. U, p. 34 (Marx appraisal).

the value of the land, but the time it might take to realize that value, he concluded that the undeveloped property should be valued at $1 per square foot, or $2.5 million. The court is unable to reconcile the Marx and Witt reports in this respect and is more convinced that Witt's value is likely the most accurate for the purpose of determining lack of equity. Accordingly, the Court concludes that the undeveloped property has a value of $2.5 million.[11]

4.     The 168 Platted Town Home Sites

There are 168 padsites that have been platted for the construction of either town homes or multifamily complexes. Some of these lots have utility service. According to the debtor, the City of Ogden has or will issue bonds to fund the construction of roads and completion of water and other utility service. It is in the valuation of this part of the debtor's property that the appraisals differ dramatically.

Marx valued these lots by reducing them to acreage and seeking comparative sales. His search yielded several comparable sales of multifamily properties. After making adjustments, Marx concluded that these lots should be valued at $50,000 per acre or $802,000 in the aggregate.

Witt's approach differed in that he applied the same development income approach that he used in valuing the undeveloped ground. Beginning with comparative sales data, he concluded that the lots were worth $25,000 apiece. Because he believes it would impossible to sell all 168 lots in a short time period at that price, he discounted the lots' value by positing that absorption of these lots into the market might take eight years. Accordingly, the value of the lots sold at a later time must be discounted to present value. In reviewing the supporting schedule for this part of the appraisal, the Court notes that Witt predicts that the greater portion of the lots will be sold in the

---

[11] *See* Ex. V, p. 22 (Witt appraisal).

-12-

latter years rather than the former. This has the effect of reducing their present discounted value. Using this method, Witt values the lots at $885,000.

Klahr's valuation is significantly higher. Using comparative sales date that is different in character from that used by Marx and Witt, Klahr concluded that the lots could be sold for $25,000 apiece and applies a fifty per cent "bulk sale" discount to value them at $2.1 million. He does not apply any discount for time for an absorption factor. Instead, he calculated his bulk sale discount by taking an average of the discounts experienced in the sale of five residential subdivision developments in Lawrence, Manhattan, and Wichita. The Court questions whether these are indeed "comparable" sales. Moreover, the Court questions whether it is realistic in the current economy to expect that a 168-lot town home development can be sold in a relatively brief exposure period. While Witt testified that the discount value or period used in making this kind of analysis is based on professional judgment, the Court suspects that the sale of the 168 lots in bulk in a short time frame is less than likely.

The Court therefore finds that the 168 townhome/multifamily platted sites should be valued at $885,000.[12]

     5.     Summary of Values

The following table summarizes the values of the respective elements of the secured creditors' collateral. As noted, the total value of $12,165,200 exceeds the amount of the combined obligations the property secures, $11,655,800.

---

[12] *See* Ex. V, p. 22 (Witt appraisal).

-13-

| | |
|---|---|
| 72 Town Homes | $7,090,000.00 |
| 18 Pads/Foundations | $140,000.00 |
| Undeveloped Land | $2,500,000.00 |
| 168 Platted Town Home Lots | $885,000.00 |
| Condemnation Award | $1,478,200.00 |
| Rents in Escrow | $72,000.00 |
| **Total Value of Collateral** | **$12,165,200.00** |

D.    The "Plan"

The debtor has not filed a chapter 11 plan.  At the hearing, the debtor's principals testified about their intentions in going forward to reorganize the debtor's affairs.  They also testified about the prospects of the River Trail Development and why they believe it will be an attractive and profitable enterprise.  As noted above, this development is adjacent to the Fort Riley army base. Force realignment in response to the wars in Iraq and Afghanistan have significantly increased the demand for housing and related services in this area.  According to RIM, the population may grow by some 30,000 people and the number of families residing off-post may exceed 4,000.[13]  Exhibit 12 is a slide titled "Family Housing Demographics" issued by the Army.  It suggests that by 2013, over 8500 families of service-men and -women will live off-post.  In addition to the demand this will create, the National Bio Agro-Defense Facility (NBAF) will be erected in Manhattan.  This facility will attract not only employees, but also the relocation of other companies to the vicinity.  The Court credits these projections, not least because of the decision by the state government to invest in expanding the highway system in this immediate area.  The developers expect that the Kansas

---

[13]  Exhibit 5.

-14-

Department of Wildlife and Parks will build a park in the addition.  They anticipate building a clubhouse, a lake, a boat dock, and other amenities.

The principals also testified that they were seeking take-out financing guaranteed by the United States Department of Housing and Urban Development through a HUD 223F loan.  HUD would lend RIM up to 85 per cent of HUD's appraised value of the 72 town homes.  RIM has contacted a broker to assist in placing this loan.  RIM offered no evidence of the terms of such a loan and the Court concludes that this effort is, at best, in the early stages.  Presumably this financing would be "permanent" and would replace TFC's current loan which is construction financing.  The debtor estimates that application expenses would amount to $40,000, to be paid from rents.

Principal Rick Meisinger testified that, in the short term, the debtor could realize substantial cash income by selling fill dirt and riprap to the road contractors building the K-18 project.  One contractor has offered to purchase between 500,000 and 2.0 million cubic yards of fill.  Meisinger testified that this fill could bring up to $2 per cubic yard, suggesting a ready revenue source of between $1.0 million and $4.0 million.  In addition, the debtor could sell water and rock.  Over a two-year period, the debtor might realize up to $300,000 for these items.  The dirt would be excavated from the area that will be rendered useless by KDOT's condemnation of a flowage easement.  On cross-examination, Meisinger recognized that some of the fill dirt might not meet highway specifications, suggesting the possibility that some of the anticipated dirt revenue may be lower than projected.  No one offered evidence of how removal of this dirt would affect the appearance or value of the development.  Meisinger did state that excavating 2 million cubic yards would leave a 15-foot deep hole over 60 to 100 acres in size.

The other principals, Art Robertson and Jack Irons, testified that other ventures involving

-15-

the property would bear fruit.  Not least of these is an anticipated storage unit facility that Irons

believes can be sold for $4.6 million.  He also noted that a number of lots have already been sold

by the debtor to other developers suggesting the existence of a market.  The last lot was sold in April

of 2009.  The property has not yet been listed as debtor has not obtained court approval for a broker.

       E.      <u>Principals' Activities</u>

At issue in the original cash collateral hearing was what each of the three principals did for

the debtor that warranted each of the three members being compensated $10,000 per month.  At the

time of the original hearing, the Court was not convinced that Iron Development performed any

tasks that were compensable from cash collateral.  At the April 8 hearing, its principal, Jack Irons

testified that he is engaged in public relations and marketing for the development, community

relations with Fort Riley and the City of Ogden, and tenant relations.  Mr. Irons is also the manager

of RIM.  He deals with the lenders, both present and anticipated, and seeks investors and purchasers

of lots.  He  did not offer any evidence concerning the structure and size of his office, his staff, or

whether Iron Development has other projects on which it works.  Irons testified he spent 80 hours

per week on RIM matters.

Rick Meisinger is the principal of RAM Engineering, Inc.  He is an engineer and testified

about the HUD loan as well as the sales of dirt and riprap.  He indicated that he spends "over full-

time" working on the River Trail project.  The Court notes that there is little if any actual

construction in process, but assumes that engineering expertise is necessary to coordinate the

activities of the debtor with those of the highway contractors.  Meisinger testified that RAM is

engaged in activity related to the debtor in excess of 40 hours per week.  RAM oversees Steward

Management, the entity that manages the rental of the 72 units.

-16-

Art Robertson is the President of Inland Constructors, Inc.  He testified to the general parameters of the River Trail project and is involved in construction of town homes and other structures, maintenance, administration of the project, and accounting.  One of his principal activities was dealing with warranty issues on the town homes.  The warranties have now expired. Robertson has previously testified that he is mostly engaged in activities on behalf of River Trail and RIM.

It remains somewhat unclear whether Irons, Robertson, and Meisinger and their companies are involved solely in the River Trail/RIM development as opposed to other work or projects.  The Court is satisfied from the testimony, however, that all three principals devote a full work week to the River Trail project and RIM.

F.    Other Findings Relevant to Cause

The loans extended by TFC are construction loans and were not intended by either party as long-term permanent financing.  They matured at or before May 16, 2008.  TFC asserts that the debtor was prohibited under its credit agreements from leasing the completed town homes.  TFC's officer, Pam Pettrick, testified that the purpose of these loans is to finance the building of town homes as inventory to be sold to investors, not to be retained and rented by RIM.  The notes issued by RIM had 180-day maturities, supporting the conclusion that the parties intended their credit relationship to extend to construction lending only.   When the notes matured, the debtor and TFC entered into a series of forbearance agreements that reduced the contract interest rate due on the loans to 8.5 per cent per annum, suspended the imposition of penalty interest, and encouraged the debtor to refinance the obligations with a permanent lender.[14]  The latest forbearance agreement

---

[14]  Ex. M.

expired on July 31, 2009. No interest has been paid by the debtor since August of 2009.[15] TFC's debt currently draws interest at the penalty rate of 12 per cent per annum or $3,067.01 per diem.

TFC's relations with the debtor post-default appear to have been rocky. The debtor has proposed to refinance the loans, but has had no success. There was no evidence of any refinance attempts other than the very preliminary proposal to seek a HUD 223F loan. Based on testimony received in other cases, the Court assumes that any refinance efforts made in late 2008 through late 2009 were likely doomed by the staggering credit markets. The debtor had proposed that the KDOT condemnation award would pay off the TFC loans. To that end, the debtor asked TFC to release an acre of land that it could sell for $200,000 to set a price for just compensation purposes, but TFC denied that request. Negotiations appear to have reached a stand-still that is evidenced by the two parties' apparent inability to resolve the insurance issues and the debtor's hesitance to pay over the second rent surplus check. The Court considers these matters that could be better resolved by effective and focused communication than by litigation.

## III.  __Analysis__

### A.  __Single Asset Declaration__

Section 101(51B) defines "single asset real estate" as real property constituting a single property or project other than residential real estate with four or fewer units. The property must generate all or substantially all of the debtor's gross income and only business of the debtor being conducted on the property must be its operation. The debtor must not be a family farmer. The Court concludes as a matter of law that the River Trail project is a single asset and, as it is the only asset of the debtor, this is a single asset case. As noted above, the debtor conceded this at the April 8,

---

[15] Ex. Q.

2010 hearing.  The Court further concludes that, in the absence of any evidence to the contrary, this case has always properly been a single asset case.  As such, the 90-day period prescribed in § 362(d)(3) began to run as of the date of the petition.  Accordingly, the automatic stay will be subject to termination if the debtor fails to either (1) file a plan on or before April 23, 2010; or (2) commence payment of contract interest to its mortgagees on that date.  Because that relief was not sought here, and because the 90 days had not, as of this writing, expired, the Court need not rule today on stay relief under that subsection.  Should a party seek relief under that subsection, an appropriate motion must be filed and a hearing conducted as set out in the prefatory language of § 362(d).

      B.     <u>Relief from the Stay, § 362(d)(1) and (d)(2)</u>

      TFC seeks relief from the automatic stay to return to Riley County District Court to conclude its pre-pending foreclosure proceeding there.[16]  Both the debtor and CoreFirst Bank object.  TFC sought this relief on two grounds: for cause including lack of adequate protection under subsection (d)(1) and for lack of equity under subsection (d)(2).  In a motion for relief to modify or terminate the stay, the moving creditor has the burden of proof on the issue of lack of equity in the property and the debtor or other parties seeking to retain the stay bear the burden on all other issues.[17]  Thus, as to the clause claim, the debtor had the burden of proof that it has afforded TFC adequate protection and that TFC lacks cause to terminate the stay.  As to the lack of equity claim, TFC had the burden to demonstrate that the debtor lacked equity in the property while the debtor and CoreFirst had the burden to demonstrate that the property is necessary to an effective reorganization.

---

[16]  Dkt. 86

[17]  Section 362(g).

-19-

1.      Cause; Lack of Adequate Protection

The debtor failed to demonstrate that it has afforded TFC adequate protection and some conditioning of the stay is warranted. TFC relies on the failure of the debtor to provide adequate replacement insurance and the debtor's general pre- and post-petition conduct as two bases to demonstrate lack of adequate protection. TFC essentially argues that when the debtor failed to contract for sufficient insurance limits, it denied TFC adequate protection. Based on this Court's analysis of the insurance certificates, the insurance offered by the debtor for 2010 significantly reduced the limits of the replacement coverage. There can be no question that the debtor's offer to insure the 72 town homes for a replacement value of $5.7 million is insufficient to provide for the replacement of property that this Court has valued at $7.1 million for equity purposes and that the debtor's own insurer has valued at $8.628 million. The debtor's agreement with TFC requires the debtor to insure the buildings to their full value. They are not fully insured and the debtor has breached that clause of the credit agreement. If the property were uninsured, this alone would be sufficient grounds to lift the stay to allow the lender to protect its interests.

But, the property is insured thanks to TFC's forced placement of replacement coverage. The Court notes that TFC's coverage does not sufficiently provide for the replacement of all the buildings and also notes that this insurance is substantially more expensive than that budgeted by the debtor. And, this insurance only covers the extent of TFC's loss, not the debtor's or that of the other secured creditors. A fair condition of retaining the stay is a requirement that the debtor place insurance sufficient to replace all of the buildings at a present day value of not less than $7.1 million not later than 21 days from the date of this order. Failing the debtor's doing so, and providing a certificate of insurance as well as a copy of the insurance policy to TFC and CoreFirst, the stay will

-20-

be lifted.

The Court further considers that TFC is, for the near future, adequately protected by its equity cushion. TFC is owed approximately $9.41 million that is secured by real property having a value of $10.655 million plus the rents and condemnation award. Of course, that equity cushion shrinks each day as the debtor's delinquent ad valorem taxes accrue interest and as TFC legitimately incurs insurance, legal, and other expenses in preserving its position. Therefore, it is appropriate that debtor pay to TFC as further adequate protection a monthly amount equal to the accrual of interest on any and all liens senior to TFC's position and that TFC be reimbursed for any cash outlay it has made for forced insurance, net of any available credit for early cancellation of the policy. TFC and/or CoreFirst shall determine the amounts that might be due as and for adequate protection and file a statement of same in this Court at its convenience. The debtor may respond to that statement's contents within 14 days and if there is a controversy concerning the appropriate payment amounts, the Court will conduct a brief hearing. Should TFC seek any professional fees that would be payable under § 506(c), it may proceed by filing an appropriate motion.

With respect to the other grounds for cause, at this early stage of the case, the Court does not consider that the debtor's pre-petition conduct is so inappropriate that it constitutes cause for stay relief. The Court cannot conclude that this case has been filed in other than good faith. While the debtor may have violated the provisions of the loan agreements by allowing the town homes to be rented, the Court does not deem this sufficient "cause" to lift the stay because the maintenance of an income stream that enables the properties to be preserved benefits the estate and, if the debtor is to be required to make interest payments under § 362(d)(3), how else can it produce income?

2.      Lack of Equity; Necessity to an Effective Reorganization

In determining whether the debtor lacks equity in the real estate and improvements, the Court considers whether the value of the property exceeds or is less than the amount of all the liens that attach to it.[18] As noted above, the sum of all the liens exceeds $11.665 million while the total value of the property securing those liens is $12.165 million. TFC failed to demonstrate by a preponderance of the evidence that the debtor lacks equity in the property. Because debtor's equity in the property is relatively small given the amount of debt and property in this case, some discussion of the necessity of the property to an effective reorganization is in order. The debtor had the burden to prove that.

Necessity and the prospect of an effective reorganization are intertwined concepts. Obviously, the real property upon which a real estate development sits is necessary to the success of that venture. Yet it is only "necessary" in the context of § 362(d)(2) if the debtor can show the reasonable possibility of an effective reorganization.[19] That concept is somewhat slippery in a case where no plan has been filed and the § 1121 exclusive period has not run. Even if a plan were on file, the debtor would not be required to prove the metaphysical certainty of the confirmation and

---

[18] *See In re Bowman,* 253 B.R. 233, 238 (8th Cir. BAP 2000) (citing *In re Indian Palms Associates, Ltd.,* 61 F.3d 197, 206-07 (3rd Cir. 1995) for test for determining equity under § 362(d)(2) as a comparison between the total liens against the property and the property's current value.); *In re Sutton* 904 F.2d 327, 329 (5th Cir. 1990) (Equity as used in § 362(d) portends difference between value of subject property and encumbrances against it); *In re Mullock*, 404 B.R. 800, 805 n. 14 (Bankr. E.D. Pa. 2009) (Debtor lacks equity in collateral, for purpose of deciding whether secured creditor is entitled to stay relief under § 362(d)(2), if value of collateral is less than sum total of all liens against it.).

[19] *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., (In re Timbers of Inwood Forest Assocs., Ltd.),* 484 U.S. 365, 375-76, 108 S.Ct. 626, 98 L.Ed. 2d 740 (1988) (describing showing that must be made in context of stay relief sought for cause or lack of adequate protection under § 362(d)(1) as a "reasonable possibility of a successful reorganization within a reasonable time.").

-22-

consummation of that plan. Rather, as Collier states, "relief from the stay should be granted if the debtor has no reasonable likelihood of reorganization."[20] Examples of such situations might be where the dissent of one creditor renders confirmation of chapter 11 plan impossible or where a plan is based on incredible assumptions and projections. Here, we have no plan, no assumptions, and no real projections. Neither TFC nor the debtor introduced any evidence concerning what the plan might be. The Court must then determine under these circumstances whether there is "no reasonable likelihood" of reorganization.

A few courts have commented on lack of equity motions in similar scenarios. All of them apply a sliding scale of the proof necessary to retain the stay. The sooner the creditor files its motion, the lower the debtor's burden is, whereas when a motion is brought several months after the exclusivity period, the debtor's burden increases and requires a showing that a successful reorganization is probable.[21] In the early stages, a debtor need only show that reorganization is a reasonable possibility.[22] Courts even deny motions for stay relief on these grounds when no plan has been filed or fully articulated where the debtor has outlined more than one scenario for a plausible reorganization and have conditioned the continuation of the stay on timely filing of such a plan.[23]

Here, the debtor has articulated some elements of a plan that might be reasonable or

---

[20] Alan N. Resnick and Henry J. Sommer eds., 3 COLLIER ON BANKRUPTCY ¶ 362.07[4][b] (15th ed. Rev.).

[21] *See In re Gunnison Center Apartments, L.P.*, 320 B.R. 391, 402 (Bankr. D. Colo. 2005); *In re Brian Wise Trucking, Inc.,* 386 B.R. 215, 219-20 (Bankr. N.D. Ind. 2008).

[22] *In re Grand Sports, Inc.*, 86 B.R. 971, 974 (Bankr. N.D. Ind. 1988).

[23] *In re Abdulla*, 2009 WL 348365 at *2 (Bankr. D. Mass. 2009).

-23-

plausible.  The debtor will first seek to refinance TFC's construction loans so that it may complete the River Trail development.  It will fund further development activity by selling lots and unplatted real estate for further development into projects like self storage that will very likely fill a need in a growing military community.  Debtor poses the further possibility that it can amass cash in the short term by selling fill dirt for the K-18 highway project from the portions of the property that will be rendered unusable by the condemnation of a flowage easement.  The Court agrees that housing demand will only increase in Fort Riley's vicinity even if the economy is unfriendly to real estate ventures at this time.  It is not unreasonable to think that a development of this type should be marketable in the next two years given the tremendous growth that is anticipated in Riley County.

Were these elements the only plan to be articulated within six months or a year after commencement of the case, they might not suffice to retain the stay.  But, given that only three months have passed since filing, the Court is inclined to adopt a more lenient standard.  This has already been a busy case.  When the debtor might have been formulating a reorganization plan, it was heavily engaged in seeking just compensation for the condemnation of a sizeable portion of the development.  Now that a condemnation award has been made, the debtor must focus on the plan.  The 180-day exclusivity period is half over.  The constraints that § 362(d)(3) imposes on single-asset cases should spur the debtor to promptly file a plan that addresses the creditors' concerns.  That section provides that if the debtor fails to file a plan within 90 days of the petition date, it must immediately commence paying the secured creditors their contract interest on a monthly basis.  As the Court understands the debtor's present cash flow, this may not be possible.  This requirement protects TFC from the grim prospect of an endless, undirected, and ungoverned chapter 11 case.  Moreover, it is clear that allowing the speedy completion of a foreclosure case will benefit only

-24-

TFC.  None of the other secured creditors are likely to benefit at all.  The appraisal testimony indicates that the bulk sale of this land in a foreclosure setting would yield significantly discounted prices.  While TFC might be paid in full, other creditors would realize very little and the estate would lose whatever has been invested by the debtor in the River Trail venture.

Therefore, the motion for stay relief for lack of equity should be denied at this time.  If the debtor does not file a plan by April 23 and opts to pay interest as § 362(d)(3) requires, the Court will condition continuation of the stay on the debtor filing a plan by May 23, 2010, six months from the petition date.  The debtor will have 60 additional days thereafter in which to confirm that plan. These time limitations are reasonable and appropriate because the debtor's equity in the estate's property will deteriorate rapidly as TFC's debt accrues interest at a rate exceeding $90,000 a month. Implementing and enforcing these time requirements will provide the debtor a legitimate opportunity to reorganize while assuring TFC and the other secured creditors that the Court will require the debtor to complete the chapter 11 process quickly and balances each party's legitimate interests.

C.    Final Cash Collateral Order

Finally, the record satisfies the Court that Irons Development serves a necessary purpose in this reorganization and that compensating Irons Development is a permissible use of cash collateral. Unfortunately, the debtor continues to leave the record barren of any real detail as to the time expended by Irons (or the other members) in their work or whether they are exclusively pursuing this development.  In the absence of any greater detail, the Court concludes that Irons should be compensated at the same rate as the other two members, $6,000 per month, and that expenditure may be added to the cash collateral budget.  This order is subject to modification upon further application to the Court and presentation of evidence upon which the Court can base a more detailed decision.

-25-

With that modification, the interim cash collateral should be deemed final and the debtor shall submit an order so concluding immediately.

## IV.    <u>Conclusion</u>

Textron's motion to declare that the property of the estate is single asset real estate is granted. Textron's motion for stay relief for cause, including lack of adequate protection, is granted by this Court's order that the continuation of the stay be conditioned upon the debtor binding and certifying to the creditors and the Court property and casualty insurance that provides for the replacement of the 72 town homes at a value of $7.1 million. This is to be effected within 14 days of the entry of this order. Textron's motion for stay relief for lack of equity is denied. However, if the debtor fails to file a plan by April 23, 2010, the 90th day after the petition date, and opts instead to pay interest as required by § 362(d)(3), the debtor shall file a plan by May 23, 2010, prior to the expiration of the exclusivity period under § 1121 and shall have 60 additional days thereafter to secure that plan's confirmation. The continuation of the stay is conditioned upon meeting these deadlines. The cash collateral order entered in January, 2010 shall become final with the alteration that Irons Development Corporation may be compensated $6,000 per month from cash collateral going forward.

# # #

-26-