**SO ORDERED.**

**SIGNED this 13 day of August, 2010.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

PUBLISHED

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **RIM DEVELOPMENT, LLC** | ) | **Case No. 10-10132** |
| | ) | **Chapter 11** |
| Debtor-in-Possession. | ) | |
| | ) | |

### ORDER ON TEXTRON FINANCIAL CORPORATION'S MOTION FOR RELIEF FROM STAY FILED PURSUANT TO 11 U.S.C. § 362(d)(3)

This single asset real estate case came before the Court on June 29, 2010 for evidentiary

hearing on the motion of Textron Financial Corporation for relief from the automatic stay.[1]  Textron

contends that debtor has not "filed a plan of reorganization that has a reasonable possibility of being

---

[1]  Dkt. 173.  The debtor-in-possession appeared by its attorney Susan G. Saidian.  The movant Textron Financial Corporation appeared by its attorney John McClelland.  Creditor CoreFirst Bank and Trust appeared by its attorney Thomas J. Lasater.  Creditor BG Consultants, Inc. appeared by its attorney John D. Conderman.

-1-

confirmed within a reasonable time," and that the stay should be lifted pursuant to 11 U.S.C. § 362(d)(3)(A).[2]

### Jurisdiction

Stay relief motions are core proceedings under 28 U.S.C. § 157(b)(2)(G) over which this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 157(b)(1) and § 1334(b).

### Facts

RIM Development, LLC ("RIM") filed its chapter 11 petition on January 22, 2010. RIM owns and is engaged in developing approximately 500 acres in Ogden, Riley County, Kansas, consisting of both planned residential and commercial development. The Court has discussed the nature of RIM's development at length in previous orders and there is no reason to add to or repeat that discussion here.[3] For the purpose of this motion, it is sufficient to note that RIM is a multi-use planned real estate development off K-18 Highway in Ogden. RIM's owners hope that its proximity to Fort Riley and Kansas State University will fuel sales and rentals of its town homes and planned apartment complexes.[4] In addition to 72 completed town home units, there are also 18 pad sites and 168 platted sites for future construction of additional town homes, and plans and sites for future

---

[2] Unless otherwise indicated, all statutory references are to the Bankruptcy Code, Title 11 U.S.C., as amended by BAPCPA (The Bankruptcy Abuse Prevention and Consumer Protection Act).

[3] *See* Dkt. 154, Orders on Single Asset Real Estate, Stay Relief, and Cash Collateral Motions entered April 21, 2010; Dkt. 62, Order Conditioning Modification of the Stay on Motion of Kansas Department of Transportation entered February 17, 2010.

[4] In addition to the expansion of Fort Riley due to military base realignments, a National Bio and Agro Defense Facility is planned near Kansas State that would provide anticipated economic growth of the area.

Case 10-10132    Doc# 276-1    Filed 08/13/10    Page 2 of 21

commercial development and improvements, including a self-storage facility, a big box retailer,[5] a convenience store, and other amenities.

The two largest secured creditors are CoreFirst Bank & Trust (CFB) and Textron Financial Corporation (TFC).[6] CFB financed RIM's acquisition of the land and holds a secured claim in the principal amount of approximately $1.6 million secured by mortgages against the real estate. TFC financed the construction of 72 town home units on a 4 acre parcel and holds a secured claim in the principal amount of approximately $9.4 million secured by mortgages against the real estate and an assignment of rents. CFB released its mortgage covering the 4 acre tract thereby elevating TFC to a first lien position with respect to the 72 town homes; TFC holds junior liens on the other real estate owned by RIM.

TFC filed this motion for relief from stay, its second, on May 4, 2010.[7] This Court has previously valued RIM's holdings at $12,165,200 and held that TFC is oversecured.[8] In addition, the Court has concluded that RIM is a single-asset debtor, thereby implicating the special stay relief provisions of § 362(d)(3).[9] RIM was therefore required within 90 days of the petition date to either

---

[5] The witness testimony indicated that a big box retailer is a "traffic generator," like a Target store.

[6] *See* Dkt. 154, p. 3.

[7] Dkt. 173. TFC filed its first stay relief motion on February 22, 2010 for cause, contending that it lacked adequate protection and debtor lacked equity in the property, § 362(d)(1) and (d)(2). *See* Dkt. 86. Following an evidentiary hearing in April, the Court granted TFC's motion as to adequate protection, conditioning continuation of the stay upon RIM providing property and casualty insurance with certain strictures, but denied TFC's motion as to lack of equity. *See* Dkt. 154.

[8] Dkt. 154, Order at pp. 13-14, 22-25.

[9] Dkt. 154, Order at pp. 18-19.

commence monthly payment of TFC's contract interest[10] or to file a plan "that has a reasonable possibility of being confirmed within a reasonable time."[11]

Debtor's Previous Dealings with TFC

A summary of the historical dealings between RIM and TFC supplies some context for the current posture of this case and the instant motion. RIM borrowed some $10.2 million from TFC through a series of loans evidenced by 9 notes, the first being made February 20, 2008 and the last being made on April 15, 2008. The parties contemplated that this financing would be short term loans with the loan proceeds used to finance construction of the 72 town home units and that RIM would obtain permanent financing when construction was completed. The loans were secured by 11 mortgages on RIM property, including a first mortgage on the 4 acre tract upon which the 72 town homes are situated. The corporate members of RIM and the individual owners of the members also guaranteed the TFC debt. As of the petition date, TFC's claim exceeds $9.4 million.

Under the loan terms and conditions, RIM was prohibited from leasing the 72 units. According to RIM, it has not been able to sell the 72 units because the loan documents also prohibited individual sales of the 72 units and difficult investor credit markets and the worsening economy hindered RIM's ability to sell the town homes as a unit. Nonetheless, RIM contends that it was able to timely make its interest payments to TFC. When it became difficult to maintain cash flow RIM began to lease the 72 units in March of 2008. The parties dispute when TFC learned of

---

[10] § 362(d)(3)(B). The required monthly interest payments would exceed some $90,000. Dkt. 154, Order at p. 18.

[11] § 362(d)(3)(A). Under its previous order, RIM's deadline to file a plan of reorganization was April 23, 2010. *See* Dkt. 154, Order at p. 19.

-4-

RIM's leasing of the 72 units.[12]  In any event, TFC declared the leasing and occupancy of the town homes to be an event of default.

Beginning on May 16, 2008, RIM and TFC entered into a series of four forbearance agreements.[13]  In general, TFC agreed to forbear from exercising its rights in connection with RIM's alleged default for 90 days while RIM sought to obtain permanent refinancing of the construction loans.[14]  When RIM failed to obtain a refinancing commitment by the deadline, the parties executed two more forbearance agreements (amending the first forbearance agreement) and extended the deadline to obtain refinancing.  Each deadline passed without RIM obtaining a commitment to refinance the TFC loans.  According to Pam Petrick, TFC's current account manager on the RIM loans, during the forbearance periods RIM represented to TFC that it was on the verge of obtaining refinancing commitments and that a loan commitment was "imminent."  Later, RIM represented that KDOT would be acquiring RIM land and paying a condemnation award of $25 million.  None of this occurred.  In January of 2009, RIM and TFC entered into the fourth and final extension of the forbearance agreement, extending the forbearance period to July 31, 2009.  As before, the forbearance period expired without RIM obtaining take-out refinancing.  RIM made no interest payments on the TFC loans after August, 2009.

On September 9, 2009, TFC filed its foreclosure action in Riley County District Court. KDOT filed an eminent domain petition on November 6, 2009 in Riley County District Court,

---

[12]  TFC subsequently made three of its loans to RIM in April, 2008, after RIM had begun to lease the 72 units.

[13]  Ex. C.

[14]  In addition, the forbearance agreement suspended the imposition of the 12% default rate of interest and provided for an interest rate of 8.5% during the forbearance period.

-5-

seeking to acquire rights-of-way and flowage easements in conjunction with the K-18 Highway interchange project. The district court granted the condemnation petition on December 3, 2009, leaving the amount of damages for the "taking" to be determined. On January 22, 2010, prior to the appraisers' award in the condemnation case, RIM filed its chapter 11 petition as a single asset real estate case. Three days later, RIM amended its petition to change the case from single asset real estate. On February 8, TFC filed a motion to determine single asset real estate status[15] and then filed its first motion for relief from the automatic stay.[16] On April 21, 2010 the Court determined that RIM was single asset real estate and ordered RIM to commence monthly interest payments or file a plan by April 23, 2010 in accord with § 362(d)(3).[17] RIM timely filed its plan and disclosure statement dated April 23, 2010[18] and a first amended plan and disclosure statement dated May 4, 2010.[19] On May 3, 2010, TFC filed the instant motion for stay relief under § 362(d)(3).[20]

<u>The Original and First Amended Plans</u>

The debtor has filed three sets of plans and disclosure statements, including the current one filed after the hearing on this motion. As of the June 29 hearing, RIM had filed two plans and

---

[15] Dkt. 49.

[16] Dkt. 86.

[17] Dkt. 154.

[18] Dkt. 156 and 157.

[19] Dkt. 178 and 179.

[20] Dkt. 173.

disclosure statements, the first dated April 23, 2010[21] and the second dated May 4, 2010.[22] The initial plan contemplated RIM obtaining a new $7,000,000 loan to pay down TFC's debt, coupled with continued development and sales of RIM's assets (including sale of dirt and rock to contractors on the KDOT K-18 highway/interchange project) and use of a $1,472,800 eminent domain award to fund its debt service and continued operations.[23] RIM's first amended plan abandoned the refinancing to pay down TFC's debt and instead, proposed to turnover the 72 town-home units to TFC and make a cash payment of $900,000 (from the eminent domain award) in full satisfaction of TFC's claim.[24] For operating capital, RIM would obtain financing (from whom and in an amount not specified) and continue construction of new residential units to generate lease or sale income, as well as possible sales of its other undeveloped real estate to pay the other secured creditors. Under the first amended plan, all secured and unsecured claims would have been paid in full in 4 years. RIM would pay its secured claims at interest rates lower than it contracted for and, as it sold tracts of real estate, would pay down secured claims not in the order of priority of the liens attaching to the real estate, but ratably *pari passu*.

The Unfiled Proposal

At the evidentiary hearing, RIM introduced Exhibit 8 – an *unfiled* draft second amended disclosure statement (no plan).[25] This disclosure statement provided that RIM would retain all of

---

[21] Dkt. 156 and 157.

[22] Dkt. 178 and 179.

[23] Dkt. 156 at ¶ 3.7, p. 10 and Art. V, pp. 11-12.

[24] Dkt. 178 at ¶ 3.7, p. 10 and Art. V, p. 11.

[25] After the June 29 hearing, the debtor filed a second amended disclosure statement, Dkt. 225, and a second amended plan, Dkt. 228. As discussed in the next section, these papers

Case 10-10132    Doc# 276-1    Filed 08/13/10    Page 7 of 21

its real estate as well as the eminent domain award from the Kansas Department of Transportation's (KDOT) condemnation of a flowage easement in furtherance of construction of the K-18 Highway interchange project near the property.[26]  Under this "plan," RIM would continue to rent out the 72 units that are TFC's collateral (in violation of the covenants of TFC's financing agreement), using the rents to pay TFC's interest and real estate taxes (some of which are attributable to property other than the 72 units).  The debtor would apply the eminent domain award to back real estate taxes, the payment of non-priority unsecured claims, with the remainder of the eminent domain proceeds being used to fund operations.  The draft also contemplated the phased sale of the 72 units to individual owner-occupants who would have access to 100 percent financing backed by the United States Department of Agriculture's Rural Housing program.  As these 72 units were sold piecemeal, their proceeds would be distributed to TFC to reduce its principal claim.  Under the proposed "sale program," the debtor projected no sales of the 72 rental units for the first two years, meaning that TFC would receive interest only for two years.  As the K-18 project progressed and the national economy improved, the balance of the residential and commercial sites could be sold for further development.  As these properties were sold, two-thirds of the proceeds would be distributed to the various lienholders, including CFB, TFC, and several mechanics lienors on a pro-rata basis rather than in accordance with the priority of the lienholders' interests.  Debtor's principals testified that a pro-rata distribution is easier than paying the various lienholders in the order of their lien priority

---

incorporated most of the terms of the unfiled plan proffered at the hearing.

[26]  RIM and KDOT have negotiated a settlement of the $1.480 million eminent domain award, increasing the amount of the award to $2,000,000 and eliminating RIM's appeal of the award.  Allocation of the award among the lien claimants, including TFC and CFB, remains before this Court in Adv. No. 10-5093, the removed eminent domain case.

because the priority varies from parcel to parcel and because, in some cases, these relative priorities are disputed. The remaining one-third of proceeds would be used to fund ongoing operations. Ultimately the debtor contemplated payment to all secured creditors in full, albeit over 6-7 years' time and not in the order of the creditors' respective lien priorities.

While the sale process went forward, TFC was to receive interest-only payments at a reduced rate of 4.75 percent as opposed to its 12 percent contract default rate.[27] These payments would be funded with the rental income from the 72 units. Other creditors would likewise receive discounted interest. Sale revenue would first be paid to current and on-going ad valorem taxes and special assessments. All secured creditors would retain their liens until they are paid in full with reduced interest. Unsecured creditors would be paid first and ahead of TFC.[28]

The draft disclosure statement referenced a liquidation analysis but did not contain one per se. The Court questions whether the debtor can effectively prepare such a document without taking a concrete position on the relative priority of the secured creditors' interests.[29]

The draft disclosure statement also contemplates that the three members of the debtor LLC will retain their interests in the debtor in exchange for a $5,000 "substantial contribution" to be made by each member. This contribution would be effected by reducing each member's annual draw of

[27] This 4.75% interest rate for TFC compares to a 6% interest rate for CFB. The draft disclosure statement indicates for years 2 and 6 only, that TFC's interest payment would be calculated at the 6% rate. *See* Ex. 8 at 00343 and 00346. The Court questions whether the 6% figure for TFC in these two years is in error. Unlike CFB and other secured creditors, no reserve interest escrow account would be established for TFC with the eminent domain award proceeds. *See* Ex. 8 at 00342-343.

[28] Presumably, by giving priority to unsecured creditors ahead of CFB and TFC, the debtor hopes to gain acceptance of its plan by an impaired class, and pursue confirmation under § 1129(b). *See* § 1129(a)(10).

[29] *See* Ex. 8 at 00333.

Case 10-10132   Doc# 276-1   Filed 08/13/10   Page 9 of 21

$72,000 from the debtor by $1,000 for five years. The projections attached to the draft indicate that the members will take out around $480,000 during the reorganization period before TFC or the other secured creditors receive full payment.[30] Yet, the members maintain that their efforts in the project and reorganization constitute "sweat equity" that should count toward their "substantial contribution" to new value. There is no auction or other provision by which a creditor might seek to participate in or acquire equity in the debtor.[31]

The sale-ability of the 72 town home units to owner-occupants is questionable. The debtor's representatives and their real estate broker, Sterling Scott, testified that the USDA's low-interest rural housing loan programs would enable tenants to reduce their housing costs by purchasing, as opposed to renting, their town homes. Scott acknowledged that selling the 72 town homes to an investor group would be difficult given the credit and capital markets, but he opined that the units could be sold individually because guarantied financing is available. Scott had not yet listed any of the town homes but suggested a listing price in the range of $125,000 - $155,000 was attainable. Nevertheless, the Court questions the debtor's projection that, even though there will be few or no sales in the first two years, the town homes' value will increase by five percent per year and that all will be sold in the latter four years of the plan.

Marty Fortney testified that he purchased 24 town home lots from RIM in 2007, built his

---

[30] According to the projection, the members' annual draws would increase 5 percent each year resulting in an annual draw of $101,311 for each member by year 8. *See* Ex. 8 at 00356.

[31] *See Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 458, 119 S.Ct. 1411, 1424 (1999) ("It is enough to say, assuming a new value corollary, that plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii).").

-10-

own town homes and sold 8 of them (with a sales price in the range of $155,000-$180,000) to investors as opposed to occupant end-users. His last sale of a town home occurred in early 2009. Of the 16 town homes that he still owns, all are leased. Cutting against the idea that these town homes will be attractive to end-user buyers is the fact that some 70% of the tenant base comes from military personnel at Fort Riley and students at Kansas State University, both of which tend to be transient populations. Mr. Fortney testified that investors are having difficulty placing 90 percent loans to acquire rental property.

There was also disputed evidence that suggests on one hand that two brigades of troops may be deployed from Fort Riley in 2011, reducing the housing demand and number of service personnel available to rent or purchase these homes. At the same time, RIM contends that as a brigade is deployed, a deployed brigade returns to Fort Riley.

TFC's appraiser, Larry Witt, contended that RIM's sales projections were too aggressive and unrealistic and did not adequately account for the construction interruption on the K-18 interchange project. Mr. Witt testified that KDOT's engineer estimated a completion date of December 2012, compared to Mr. Scott's projection of February 2011. As acknowledged by Mr. Scott, there is some credence to Witt's concern regarding the marketability of the RIM property until the K-18 construction project is completed and good access to commercial properties exists. Witt also indicated that the annual 5 per cent sales price increase of the 72 units is unwarranted, suggesting that such a price increase assumes the units are new or like new when in fact they are not and sales of the 72 units would be deferred the first 2 years of the plan and continue to be rented.

The Court's conclusion is that the sale of these units to owner-occupants is, as RIM projects, unlikely to occur in a short time. These units are more suitable for purchase by investors, but, as

noted by the witnesses, the credit environment makes such purchases very speculative in the near term particularly given the continuation of road construction in the area that will tamp down commercial and multi-family development.

<u>The Second Amended Plan</u>

After the June 29 evidentiary hearing, RIM filed its second amended plan and disclosure statement dated July 1, 2010.[32] Even though this plan was not before the Court at the June 29 hearing, it has become the plan and must be considered in determining whether to grant TFC's motion.[33] Under this plan, the town homes will eventually be sold to individual home buyers using Rural Housing financing. TFC would still only receive interest payments calculated at 4.75 percent as opposed to their 6 percent contract rate or 12 percent default rate. The debtor still anticipates sales being slowed during the two years of construction on K-18. CFB will receive nearly one million dollars of the eminent domain award to reduce or eliminate CFB's first lien. An additional $337,000 of the award funds will be paid on past due real estate taxes for 2007, 2008 and 2009, plus special assessments for 2009.

In the current plan, the debtor has changed its approach to the sale of the non-town home property. After the first year, the debtor projects sales income that includes $1.5 million from non-town home property sales to be paid to the secured creditors. Textron, by far the largest creditor, will receive very little payment until the third year (when town home sales accelerate). Under the plan, the debtor proposes that CFB receive two-thirds of all non-town home proceeds until its claims are satisfied. Thereafter, the two-thirds' share of the proceeds will be paid to BG Consultants and

---

[32] Dkt. 225 and 228.

[33] *See* § 1127(a) ("...the plan as modified becomes the plan.").

Kolde Construction until their claims are satisfied. These claims will apparently be paid in the order of their priority in the property. Only after CFB's, BG's, and Kolde's claims are satisfied will TFC participate in the proceeds of non-town home sales. This marks a change from the debtor's prior attempt to simply repay these claims pro-rata and implicitly reflects the debtor's view of the respective priorities of the creditors' liens on the real property. This plan does not fundamentally change the manner in which TFC's liens will be treated. As before, the remaining one-third share of the sale proceeds will be used to fund operations.

Since the June 29, 2010 hearing on this motion, the debtor has sought the extension of the stay to the principals of RIM under § 105(a) by motion and by the filing of an adversary proceeding for injunctive relief on August 2, 2010. In addition, TFC has sought to terminate RIM's use of its cash collateral and RIM has sought leave to use eminent domain proceeds to pay its professionals. Those matters are set for later hearing.

<u>Analysis</u>

Section 362(d)(3) provides that as to single asset debtors, the stay terminates 90 days after the latter of the petition date or the date the Court determines that the debtor is a single-asset debtor unless one of two conditions is met. The stay may continue in effect if the debtor has filed a plan "that has a reasonable possibility of being confirmed in a reasonable time" or if the debtor has commenced monthly payments equal to interest at the applicable non-default contract interest rate on the value of the debtor's real estate. RIM has not commenced interest payments that would meet the requirements of § 362(d)(3)(B). Therefore, in order for the stay to remain in force, the debtor was required to demonstrate that its plan has a reasonable possibility of being confirmed in a reasonable time. This is a broad standard that requires the court to consider how the current plan

-13-

stacks up against the confirmation requirements in § 1129. The debtor is not obliged to prove it will confirm the plan it has filed; instead the test is whether the plan is confirmable. The debtor has the burden to demonstrate this by a preponderance of the evidence.[34] If RIM's plan is not confirmable, stay relief is mandatory.[35]

The precursor of § 362(d)(3)'s language is found in the Supreme Court's 1988 *Timbers* case in which the court held that in order to defeat a stay relief motion predicated on the debtor's property not being necessary to an effective reorganization under § 362(d)(2)(B), the debtor had to demonstrate that there "must be 'a reasonable possibility of a successful reorganization within a reasonable time.'"[36] While a hearing on a (d)(3) motion should not be a mini confirmation hearing, the debtor must show some reasonable possibility of confirming a plan.[37] As one court has artfully stated, "the terms ... 'reasonable possibility' within a 'reasonable time' are rather vague and hopeful terms that require a far lower standard of proof than what will be required of the Debtor [at the

---

[34] *See* § 362(g)(2).

[35] *See In re Carolina Commons Development Group, LP,* 2010 WL 1965895 at *2 (Bankr. E.D. N.C. 2010) (Where plan submitted is so "fatally flawed," the court must grant stay relief.); *In re CBJ Development, Inc.,* 202 B.R. 467, 470 (9th Cir. BAP 1996) (Stay relief is mandatory where debtor does not satisfy the provisions of § 362(d)(3).).

[36] *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 376, 108 S.Ct. 626, 98 L.Ed. 2d 740 (1988). Section 362(d)(3) was added by the Bankruptcy Reform Act of 1994. Its purpose was to address a perceived abuse in single asset real estate cases in which debtors attempted to delay mortgage foreclosures when there was little chance that they could reorganize successfully. *In re Triumph Inv. Group, Inc.,* 2009 WL 2916986 at *2 (Bankr. E.D. Pa. 2009) (citing *Collier on Bankruptcy* treatise).

[37] *In re Windwood Heights, Inc.*, 385 B.R. 832, 838 (Bankr. N.D.W.Va. 2008) (comparing the standard imposed at a confirmation hearing to the standard for obtaining stay relief under § 362(d)(3).

-14-

confirmation hearing]."[38]  Thus, the Court should not expose the debtor to the same level of scrutiny

that it will endure if its plan makes it to confirmation, but the Court does require that debtor

demonstrate that its plan has "a realistic chance of being confirmed [and] is not patently

unconfirmable."[39]

To determine whether this plan has a reasonable possibility of being confirmed, the Court

looks to § 1129(a) which lists sixteen requirements to be met.  If all of these requirements except

the unanimous acceptance of the plan by all the classes of claims or interests referenced in §

1129(a)(8) are met, the debtor may seek to cram down the plan by demonstrating that it is "fair and

equitable" as that term is defined in § 1129(b).

Even under the lighter scrutiny that is to applied in determining "reasonable possibility," this

plan does not realistically appear to meet several of the requirements in § 1129(a).  The first one is

§ 1129(a)(3), that the plan has been proposed in good faith.  Both the debtor's pre-petition and post-

petition conduct have suggested a "merry chase."   The shifting approaches and positions of the

debtor pre-petition have been detailed at length in the facts section above.  The plan currently being

balloted is the third one filed.  Each plan has successively diminished the treatment provided to TFC.

Initially, the debtor proposed to refinance $7.0 million of TFC's debt while permitting the debtor

to use the rents as part of its operating revenue and repay the remainder of TFC's claim over time.

RIM was to continue developing its assets and selling real estate, rock, and dirt while servicing debt

with the proceeds of the eminent domain award.   RIM's first amended plan abandoned the

---

[38]  *In re Hope Plantation Group, LLC*, 393 B.R. 98, 104 (Bankr. D.S.C.2007).

[39]  *In re Carlsbad Development I, LLC*,  2009 WL 588662 at *3 (Bankr. D.Utah 2009), citing *Windwood Heights, supra* at 838.

refinancing proposal, instead offering to surrender the town homes that the Court has valued at $7.1 million to TFC and pay an additional $900,000 of the eminent domain award to TFC in full satisfaction of its $9.4 million dollar oversecured claim. The current plan contemplates the debtor retaining the town homes, collecting the rents, and marketing the homes while paying TFC a discounted interest rate on its oversecured claim. Each of these treatments would be patently unconfirmable in the face of TFC's persistent objections. Nevertheless, RIM has garnered four additional months of bankruptcy protection without paying full contract interest as required by § 362(d)(3)(B). At the same time, the Court has had to resolve fairly straightforward cash collateral and adequate protection issues like the payment of insurance on the property by RIM. RIM's three principals continue to receive substantial money ($6,000/month each) for their services. RIM's ever-changing approach to this reorganization hints at the obfuscation of the creditors' reasonable efforts to protect their interests in the hope that something good will happen.

Section 1129(a)(8) requires that each class accept the plan or not be impaired. All secured and unsecured non-priority classes are impaired here and unanimous acceptance appears highly unlikely.

Section 1129(a)(11) requires that the plan be feasible.[40] This plan's treatment of TFC's secured claim relies on (1) the availability of near-term government guaranteed 100 percent financing of the 72 town homes; (2) a thriving market for owner-occupants to purchase properties that are presently occupied by military personnel and college students, two transient populations; and (3) the return of capital lending to the real estate development market to fund purchases of

---

[40]  *See In re Pikes Peak Water Co.,* 779 F.2d 1456, 1460 (10th Cir. 1985) (discussing the feasibility requirement).

-16-

RIM's other development property. None of this appears realistic based on the record to date. The debtor cannot afford to pay TFC's accruing interest and proposes to pay a discounted rate upon confirmation even though TFC is oversecured. TFC has protested that the 4.75 percent rate is below-market and no evidence was offered by the debtor in that connection.[41] This casts doubt over the feasibility of this plan.

Even if RIM were to satisfy the Court at confirmation that its motives are pure and that all other requirements of § 1129(a) can be met, in the absence of TFC's consent, § 1129(a)(8) requires that each class of debt or interest either accept the plan or be unimpaired. If TFC were to reject the plan and all of the other requirements of § 1129(a) were met, the debtor could seek to cram down its treatment of TFC under § 1129(b)(1) and (2). This would require a showing that the plan is fair and equitable. Section 1129(b)(2)(A) sets out three permissible alternative treatments of allowed secured claims. Section 1129(b)(2)(B) sets out the parameters for dealing with interest-holders and defines the absolute priority rule. Applying these provisions to the debtor's plan casts considerable doubt on the possibility of its confirmation because TFC's claim cannot be crammed down as RIM proposes.

Section 1129(b)(2)(A)(i) treatment requires that the creditor retain its lien securing the claim and that the creditor receive on account of its claim a series of deferred cash payments that have a present value as of the effective date of the plan equal to the value of its security. In this case, that would mean that TFC would be entitled to receive a series of payments that equal at least $9.4

---

[41] Tenth Circuit precedent suggests that over-secured creditors like TFC are entitled to receive market-rate interest on cram-down. See *In re Hardzog*, 901 F.2d 858, 860 (10th Cir. 1990), holding in a chapter 12 case that "[i]t therefore follows that the most appropriate interest rate is the current market rate for similar loans made in the region at the time the new loan is made."

-17-

million, the amount of TFC's pre-petition claim, plus any contract interest that has accrued since the petition date, but net of any adequate protection that TFC has received and applied. The Court found TFC to be oversecured in its prior order of April 21, 2010. The debtor's plan instead provides for TFC to receive interest only at the rate of 4.75 percent, unless and until the town homes begin to sell. When that occurs, TFC would receive all of the proceeds. The debtor projects minimal sales in the first year. Meanwhile, the eminent domain award as well as the sale proceeds of the other real estate in which TFC claims a lien will be distributed to creditors who may hold lesser priority in it. This proposed treatment is unlikely to satisfy the payment option in § 1129(b)(2)(A)(i).

Section 1129(b)(2)(A)(ii) provides for the debtor to sell any property subject to the liens of the secured creditors free and clear of their liens, such liens to attach to the proceeds of the sales and either be retained by the debtor and "paid for" as prescribed in subsection (b)(2)(A)(i) or repaid to the creditors as the indubitable equivalent of their claims under subsection (b)(2)(A)(iii). It is difficult to evaluate the debtor's plan in this respect because there is no detailed disclosure concerning the relative priority of the secured creditors in the real property, other than the town home project. Further, even if RIM's priority determination is correct, one-third of the proceeds of the real estate are to be contributed to operating expense, not payment of claims. This treatment denies TFC payment of an amount equal to the value of its liens as of the effective date and fails to provide for TFC to retain its lien, violating the provisions of (b)(2)(A)(i). Nor, as discussed below, does this treatment allow TFC or the other secured creditors to receive the indubitable equivalent of their claims.

Section 1129(b)(2)(A)(iii) allows plan proponents to provide secured creditors an indubitable equivalent. In other words, through a combination of the approaches outlined in the prior two

-18-

subsections or by fashioning some other treatment, the plan must provide a secured creditor what it had in the first place. The concept of "indubitable equivalent" may be traced back to the decision of Judge Learned Hand in *In re Murel Holding Corp.*[42] There, Judge Hand commented that –

> . . . we are to remember not only the underlying purposes of the section, but the constitutional limitations to which it must conform. It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most *indubitable equivalence*.[43]

The Tenth Circuit Bankruptcy Appellate Panel has stated that "[e]vidence of the requisite indubitable equivalent is present if, under the treatment proposed in the Plan, there is no reasonable doubt that [the lender] will receive the full value of what it bargained for when it made its contract with Debtor."[44] Here, where the debtor's plan openly rearranges the lien priorities of the respective secured creditors by providing for their real estate collateral to be sold and the proceeds distributed in a manner inconsistent with the priorities of their liens, the Court doubts that any of them will receive "the full benefit of what [they] bargained for." The treatment exposes the secured creditors, and particularly TFC, to increased risk and exposure by denying them a safe and completely compensatory substitute for their collateral. This treatment alone is "patently unconfirmable."

To be "fair and equitable," a plan must also provide that the interest holders, here the three member companies of RIM, receive nothing unless the unsecured creditors are paid in full or agree

---

[42] 75 F.2d 941 (2nd Cir. 1935).

[43] *Id.* at 942, referring to adequate protection formerly under § 77B of the Bankruptcy Act, 11 U.S.C. § 207, emphasis added.

[44] *In re Investment Company of The Southwest, Inc.*, 341 B.R. 298, 319 (10th Cir. BAP 2006).

-19-

to less favorable treatment. Section § 1129(b)(2)(B)(ii) provides that the holder of any interest that is junior to the unsecured classes of debt may not receive or retain any property on account of the holders' interest. Here, the unsecured creditors may eventually be paid in full through the proceeds distribution questioned above, but the interest holders and their principals contemplate retaining their interests in RIM for what seems to be very nominal consideration. The Court questions whether the very minimal contribution these principals propose will be a sufficient "substantial contribution" for them to retain their interest in the company. In addition, there is no provision for the creditors to participate in any manner in acquiring an interest in the reorganized debtor. The retention by the current interest-holders of the exclusive right to retain their interest without competition or market valuation is prohibited by § 1129(b)(2)(B)(ii).[45] This, too, renders the debtor's plan "patently unconfirmable."

Conclusion

At day's end, even under the lighter scrutiny to be applied in deciding a motion under § 362(d)(3), the Court cannot conclude that RIM's plan has a reasonable possibility of being confirmed within a reasonable time over the persistent objections of TFC. The Court has attempted to extend some benefit of the doubt here, but cannot see how this debtor will be able to fulfill the statutory requirements of § 1129. This renders the plan patently unconfirmable and requires the Court to modify the stay in these circumstances. The Court grants TFC relief from the automatic stay and leave to proceed with the realization of its contractual rights and claims in any appropriate forum, provided, however, that so long as the debtor remains in bankruptcy before this Court, TFC

---

[45] *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Partnership*, 526 U.S. 434, 458, 119 S.Ct. 1411, 143 L.Ed. 2d 607 (1999).

be required to report to the Court and all other parties concerning any relief it secures in another forum and any surplus it receives upon commencement and completion of any foreclosure or other collection proceeding.  TFC's Motion is GRANTED.

# # #